**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC d/b/a BRAZOS LICENSING AND DEVELOPMENT, | |
| Plaintiff, | Civil Action No. 6:20-cv-454 |
| | Civil Action No. 6:20-cv-461 |
| v. | Civil Action No. 6:20-cv-465 |
| MICROSOFT CORPORATION, | |
| Defendant. | |

**<u>DEFENDANT'S SUR-REPLY MARKMAN BRIEF</u>**

## TABLE OF CONTENTS

I.   UNCONTESTED TERMS IMPROPERLY BRIEFED BY WSOU ..................................... 1

II.  DISPUTED TERMS FOR CONSTRUCTION .................................................... 2

   A.   Terms of U.S. Patent No. 7,106,702 (Case No. 6:20-cv-00461-ADA) ............................ 2

     1.   "active nodes" ................................................................................ 2

     2.   "monitoring the active nodes to determine if one of the active nodes gets
disconnected from the network", "said active nodes monitoring one another to detect if
an active node becomes disconnected from the network", and "monitoring the active
nodes to detect if one becomes disconnected from the network" ........................................ 4

     3.   "each of said nodes having a user database" ................................................ 6

     4.   "activating the AAA functions of the active nodes" ........................................ 8

     5.   "geographic distance therebetween is maximized", "geographic distance between
active nodes is maximized", "geographic distance between it and the active node which
got disconnected from the network is maximized", and "node selected in step (d) is
chosen to maximize a sum of a geographic distance between the active nodes and a
geographic distance between the node selected in step (d) and the node which got
disconnected from the network" ........................................................................ 9

     6.   "logging changes to the user databases for the active nodes thereby updating the
same to reflect changes in information contained therein" and "wherein each of the
active nodes logs changes to its user database thereby updating the same to reflect
changes in information contained therein" ............................................................ 11

   B.   Terms of U.S. Patent No. 7,366,160 (Case No. 6:20-cv-00454-ADA) ......................... 12

     1.   "selecting two or more parameters of a network" and "measuring and/or
calculating at two or more times values of the network parameters" ............................... 12

     2.   "network parameter" ...................................................................... 15

     3.   "determining at two or more times the value of a service indicator", "determining
a trend of the indicator", and "determining as a function of the trend of the indicator" ..... 16

     4.   "service indicator" ........................................................................ 16

     5.   "determining as a function of the trend of the indicator a time of the service
indicator crossing a defined threshold" ................................................................ 17

     6.   "neural network determines rules of association between a service trend and
service parameter values" ................................................................................ 19

     7.   "calculating a mathematical expectation of financial loss as a function of the
network service trend determined" .................................................................... 20

8.   "determining a capacity to provide a network service at a given time" ..................... 21

C.   Terms of U.S. Patent No. 8,274,902 (Case No. 6:20-cv-00465-ADA) .......................... 21

1.   "network that branches, downstream of the collection point".................................... 21

2.   "estimating a packet loss rate" and "an estimate of a packet loss rate"...................... 23

3.   "packet loss rate" ................................................................................................. 24

4.   "wherein the collected data relate to packet losses on the portion of a GPRS core network extending from the collection point to a plurality of [base / mobile] stations" ..... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
   544 F.3d 1341 (Fed. Cir. 2008)....................................................................................24

*Apple, Inc. v. Ameranth, Inc.*,
   842 F.3d 1229 (Fed. Cir. 2016)....................................................................................13

*Aventis Pharma S.A. v. Hospira, Inc.*,
   675 F.3d 1324 (Fed. Cir. 2012)....................................................................................18

*Boss Control, Inc. v. Bombardier Inc.*,
   410 F.3d 1372 (Fed. Cir. 2005)....................................................................................19

*Cave Consulting Grp., LLC v. OptumInsight, Inc.*,
   725 F. App'x 988 (Fed. Cir. 2018) ..................................................................... *passim*

*Dow Chemical Co. v. Nova Chemicals Co. (Canada)*,
   803 F.3d 620 (Fed. Cir. 2015).................................................................................9, 10

*dunnhumby USA, LLC v. emnos USA Corp.*,
    No. 13-cv-0399, 2015 WL 1542365 (N.D. Ill. Apr. 1, 2015)................................11

*Edwards Lifesciences LLC v. Cook Inc.*,
   582 F.3d 1322 (Fed. Cir. 2009)....................................................................................19

*Embrex, Inc., v. Serv. Eng'g Corp.*,
   216 F.3d 1343 (Fed. Cir. 2000)....................................................................................23

*Fenner Invs., Inc. v. Cellco P'ship*,
   778 F.3d 1320 (Fed. Cir. 2015)....................................................................................18

*Fife & Drum, Inc. v. DelBello Enters., LLC*,
   No. 17-3676, 2019 WL 5692124 (D.N.J. Nov. 4, 2019) ...........................................9

*Halliburton Energy Servs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008)....................................................................................11

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008)..............................................................................12, 15

*Horizon Pharma, Inc. v. Dr. Reddy's Labs. Inc.*,
   – Fed. App'x. –, No. 2019-1607, 2021 WL 48428 (Fed. Cir. Jan. 6, 2021)............................25

*Horus Vision, LLC v. Applied Ballistics, LLC*,
No. 13-cv-5460-BLF, 2014 WL 6989233 (N.D. Cal. Dec. 9, 2014) .........................................8

*Howmedica Osteonics Corp. v. DePuy Orthopaedics, Inc.*,
No. 11-CV-6498 SDW MCA, 2013 WL 3455727 (D.N.J. July 9, 2013) ................................6

*Inguran, LLC v. ABS Global, Inc.*,
No. 17-cv-446-wmc, 2019 WL 943515 (W.D. Wis. Feb. 26, 2019) ......................................10

*Int'l Test Sols., Inc. v. Mipox Int'l Corp.*,
No. 16-cv-00791-RS, 2017 WL 1367975 (N.D. Cal. Apr. 10, 2017) .....................................11

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) ....................................................................................20, 21

*Interwoven, Inc. v. Vertical Comput. Sys., Inc.*,
No. C 10-4645 RS, 2011 WL 6936186 (N.D. Cal. Dec. 30, 2011) .......................................23

*Iris Connex, LLC v. Dell, Inc.*,
235 F. Supp. 3d 826 (E.D. Tex. 2017) ...........................................................................2, 23

*Kinik Co. v. Int'l Trade Comm'n*,
362 F.3d 1359 (Fed. Cir. 2004) .......................................................................................7, 13

*Light Transformation Techs. LLC v. Lighting Sci. Grp. Corp.*,
No. 2:12-cv-826-MHS-RHP, 2014 WL 3402125 (E.D. Tex. July 11, 2014) ....................8, 11

*M-I LLC v. FPUSA, LLC*,
No. 15-cv-406-DAE, 2015 WL 4460305 (W.D. Tex. July 21, 2015) ................................7, 13

*MacroSolve, Inc. v. Antenna Software, Inc.*
No. 6:11-cv-287-MHS-KNM, 2014 WL 243429, at *4 (E.D. Tex. Jan. 21,
2014) ...............................................................................................................................13

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014) .........................................................................................................9

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
442 F.3d 1331 (Fed. Cir. 2006) ...........................................................................................19

*Phoenix Licensing, L.L.C. v. Advance Am.*,
No. 2:15-CV-1367-JRG-RSP, 2016 WL 6217180 (E.D. Tex. Oct. 25, 2016) ......................20

*RideApp, Inc. v. Lyft, Inc.*,
No. 18-cv-07152-JST, 2019 WL 7834175 (N.D. Cal. Oct. 16, 2019) ....................................9

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
824 F.3d 999 (Fed. Cir. 2016) ...............................................................................................5

*Saffran v. Johnson & Johnson*,
  712 F.3d 549 (Fed. Cir. 2013)....................................................................................5

*Sonix Tech. Co. v. Publications Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017)....................................................................................8

*SpaceTime3D, Inc. v. Samsung Elecs. Co., Ltd.*,
  No. 2:19-cv-00372-JRG, 2020 WL 7183538 (E.D. Tex. Dec. 7, 2020)................12, 15

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  789 F.3d 1335 (Fed. Cir. 2015)..................................................................................10

*Trs. of Columbia Univ. v. Symantec Corp.*,
  811 F.3d 1359 (Fed. Cir. 2016)....................................................................5, 18, 19

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
  587 F.3d 1339 (Fed. Cir. 2009)..................................................................................20

*Watts v. XL Sys., Inc.*,
  232 F.3d 877 (Fed. Cir. 2000)................................................................................7, 23

In its reply brief, WSOU continues to turn the process of claim construction on its head. WSOU resists any attempt to attribute a definite meaning to a claim term, ignoring the specifications' descriptions of the problems to be solved, the state of the art, and the inventions themselves. WSOU ignores that the purpose of claim construction is to assist the jury, and that the specification is the single best guide to the meaning of claim terms. Finally, WSOU repeatedly implies that expert testimony is required for claim construction, despite the fact that courts routinely resolve claim construction disputes without relying on experts. For these reasons and the reasons set forth below, the Court should adopt Microsoft's proposed constructions of the disputed terms.

## I.       UNCONTESTED TERMS IMPROPERLY BRIEFED BY WSOU

There is no dispute regarding the first two terms briefed by WSOU. To clarify the record, WSOU's attempt to blame Microsoft for "misunderstanding which terms Microsoft seeks to construe" is based on a falsehood and belied by WSOU's own actions. WSOU Reply Brief ("Reply") at 1. Microsoft's position was not, as WSOU asserts "a shifting target up until the week before the opening brief was due to be filed." *Id.* Microsoft informed WSOU that it did not believe these terms required construction ten days before WSOU's opening brief was due. *See* Microsoft Responsive Brief ("Resp."), Ex. 1. Thereafter, WSOU expressly relied on the parties' agreement to drop these terms as a justification for reducing the number of pages allocated for Markman briefing. *Id.*, Ex. 2 ("With the recent reduction in claim terms since yesterday, we think the briefing limit should revert back to forty [pages]").

Nor does the parties' mutual agreement to drop these two terms support the notion that "Microsoft believes it alone is allowed to identify terms for construction." Reply at 1. The fact that the parties have briefed multiple terms identified only by WSOU for construction (*e.g.*, "active nodes" and "packet loss rate") clearly disproves WSOU's nonsensical suggestion.

1

## II.     DISPUTED TERMS FOR CONSTRUCTION

### A.     Terms of U.S. Patent No. 7,106,702 (Case No. 6:20-cv-00461-ADA)

#### 1.     "active nodes"

The claimed invention of the '702 patent is designed to leverage "redundancy in functionality and/or resources so that one or more back-ups may take over when functions and/or resources are lost due to failure or otherwise." '702 patent, 1:23-26.  To provide this redundancy, and purportedly solve the problem of resource loss, the patent explicitly discloses a one-to-one relationship between an active node and a user database.  Microsoft's proposed construction captures this relationship.  Under WSOU's interpretation of "active nodes," the claimed invention of the '702 patent would fail to solve the problem it sets out to address.

The parties agree that the word "active" refers to the state of AAA functionality.  But that is only half of the term in dispute; "nodes," a term of art, must be addressed as well.  A jury will not understand what it means for a node to be in an "active state of AAA functionality" without further guidance, and the purpose of claim construction is to assist the jury in understanding the scope of the claims.  *See Iris Connex, LLC v. Dell, Inc.*, 235 F. Supp. 3d 826, 847 (E.D. Tex. 2017) (citing *Embrex, Inc., v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000)).  Only Microsoft's construction achieves this purpose, explaining that "active nodes" carry out the AAA functions for the network by employing their respective databases, as described in the specification.  *See* '702 patent, 2:8-11.

The specification informs a Skilled Artisan that each "active node" has its AAA functions turned on (a point on which the parties agree), *and* that each active node has its own user database, as described in Microsoft's response.  Despite its conspicuous brevity, the patent is thoroughly consistent in this regard.  Specifically, the Abstract states each node "has a user database" and that "active nodes use their respective user databases to conduct the AAA

2

functions for the network." The specification further describes AAA functional nodes (whether active or non-active) as "capable of maintaining a user database associated with the AAA functions." '702 patent, 3:9-10. And Figure 2 and its corresponding text, which provides the sole "detailed description" for a method claim such as claim 1, describes "provid[ing] initial user databases for all" nodes. *See id.*, Fig. 2, Item 20.

The requirement that each active node has its own user database is not limited to certain embodiments. It is tied to the fundamental purpose of the claimed invention to preserve redundancy of AAA functionality even if nodes are "destroyed by an enemy," while also addressing network bandwidth issues that could arise from user database synchronization traffic among all of the nodes. *See*, *e.g.*, *id.*, 1:23-53; *see also infra*, Section II.A.3 "each of said nodes having a user database"). The patent disparages sharing a central database, *id.*, 1:31-35, and proposes selecting two of the nodes to be active, and synchronizing the user databases of the active nodes; *id.*, 2:17-32. *See Cave Consulting Grp., LLC v. OptumInsight, Inc.*, 725 F. App'x 988, 995 (Fed. Cir. 2018) (relying on statements about the difficulties and failures in the prior art in the absence of express disclaimer where "the specification does more than discuss certain disadvantages of the prior art methods. It distinguishes its invention from them, particularly pointing out what the invention does not use.").

WSOU offers no response to the fact that the '702 patent's Abstract expressly provides that active nodes have their own respective user databases. Moreover, WSOU's reply brief drops its previous untenable argument that Microsoft's proposed construction would somehow exclude a preferred embodiment of the '702 patent. *See* WSOU Opening Brief ("Br.") at 5-6. It does not. Instead, WSOU attacks Microsoft's accurate statement that a "duplicate copy" of a user database, as recited in claim 8, is not the same as an initially-provisioned user database. WSOU

willfully misconstrues Microsoft's construction as requiring two databases per active node.

Reply at 3.  Microsoft has never argued or implied such a requirement.  Rather, any node that

carries out AAA functionality[1] by employing its own (singular) user database, satisfies

Microsoft's proposed construction of "active node."

> **2.   "monitoring the active nodes to determine if one of the active nodes gets disconnected from the network", "said active nodes monitoring one another to detect if an active node becomes disconnected from the network", and "monitoring the active nodes to detect if one becomes disconnected from the network"**

Microsoft's proposed construction captures the concept of the decentralized monitoring

process described in the '702 patent, in which two active nodes monitor one another to detect if

one becomes disconnected from the network.  The inventors of the '702 patent identified this

process as a core aspect of the invention, which represented an advantage over the prior art.  The

Court should not read the "monitoring" phrases to cover embodiments with the purported

disadvantages that the '702 patent seeks to overcome.

In the Background section of the '702 patent, the inventors explained that the purported

invention was meant to overcome problems arising from a centralized architecture, whereby the

failure of a single component could disrupt the entire network.  *See, e.g.*, '702 patent, 1:31-35

("Should a node be the only one capable of AAA functionality and/or be the sole location for

maintenance of the user database, the destruction of that node or its separation from the network

would undesirably disrupt the entire network."); 1:51-53 ("The present invention contemplates a

new and improved method and/or system which overcomes the above-referenced problems and

---

[1] WSOU also puzzlingly asserts that Microsoft's construction would encompass nodes that merely "have the *capability* to carry out AAA functions when required[.]"  Reply at 2.  Not so. Microsoft's construction plainly establishes that only a node that *actually does* carry out AAA functions by employing its user database is an active node.

others.").   The decentralized monitoring process described throughout the rest of the specification represents this purported improvement; it is not merely an "exemplary disclosure in the specification[,]" as WSOU suggests.  Reply at 3.

WSOU does not (and cannot) deny that the **only** examples of "monitoring" set forth in the specification align with Microsoft's construction.  Instead, WSOU simply argues that claims are not necessarily limited to subject matter described in a patent's sole disclosed embodiment.  *See* Reply at 3-4 (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 907 (Fed. Cir. 2004)).  But more recent Federal Circuit case law has reinforced that a claim term should be construed in accordance with its "[e]xtensive, consistent usage in the specification[.]"  *Saffran v. Johnson & Johnson*, 712 F.3d 549, 560 (Fed. Cir. 2013); *see also Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) (citing *Phillips*, 415 F.3d at 1320-21) ("Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents.").  And where "the specification makes no mention of" particular subject matter, "construing the instant claims to encompass that subject matter would likely render the claims invalid for lack of written description." *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016) (citing *Genry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998)).  Here, where the '702 patent consistently and exclusively describes a decentralized monitoring process between the nodes, the Court should not expand the meaning of the "monitoring" terms to encompass some undisclosed monitoring process (whether centralized or otherwise).

Nor does the doctrine of claim differentiation impact this analysis.  As WSOU acknowledges, this doctrine is a rebuttable presumption.  Reply at 3.  Here, the presumption has

been rebutted, and not "simply because Microsoft says so[,]" as WSOU suggests.  Reply at 4.

Rather, claim differentiation does not apply because "the specification does not provide any

additional configurations [beyond what Microsoft's construction captures] that would be

effective" in achieving the purpose of the '702 patent.  *Howmedica Osteonics Corp. v. DePuy*

*Orthopaedics, Inc.*, No. 11-CV-6498 SDW MCA, 2013 WL 3455727, at *13 (D.N.J. July 9,

2013) (citing *O.I. Corp. v. Tekmar Co., Inc.*, 115 F.3d 1576 (Fed. Cir. 1997)); *see also Cave*

*Consulting*, 725 F. App'x at 995 ("However, in view of the specification's consistently limiting

description, we conclude that these interpretive canons, despite the later-added dependent claims,

cannot overcome the claim scope that is unambiguously prescribed by the specification.").

### 3.    "each of said nodes having a user database"

The desired "redundancy" that the '702 patent purportedly provides stems from the

requirement that the recited nodes each have their own user database.  WSOU's argument to the

contrary is based on its misconception that "nothing in the cited disclosures precludes nodes

from *sharing* user databases, such as, for example, one pair of nodes sharing one user database

and another pair of nodes sharing another user database."  Reply at 5.  But the patent *does*

preclude such an arrangement.

As explained in Microsoft's responsive brief, the '702 patent consistently uses exclusive,

possessive language to indicate a one-to-one relationship between node and user database.  *See*

Resp. at 12-13.  In response, WSOU argues that the specification's description of "nodes" and

"their respective user databases" in the plural form means that this limitation could be satisfied

by a pair of nodes that share a single database.  Such a strained reading of the specification

simply ignores the inventor's repeated use of the words "each" and "respective."  Together, these

words indicate that the nodes "each" have a user database and that those databases are separate.

The Background section of the '702 patent also support's Microsoft's construction.  It suggests that a shared database is a disadvantage of other systems in the field because it can provide insufficient redundancy.  *See, e.g.*, '702 patent, 1:31-39 ("Should a node be the only one capable of AAA functionality and/or be the sole location for maintenance of the user database, the destruction of that node or its separation from the network would undesirably disrupt the entire network. Therefore, particularly in military applications, the threat of a focused attack on and/or the higher potential for destruction of network nodes (as compared to civilian networks) makes redundancy in AAA functionality and/or the user database a real advantage.").[2]  The discussion of this disadvantage necessarily informs the scope of the '702 patent.  *See, e.g.*, *Cave Consulting*, 725 F. App'x at 995; *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1365 (Fed. Cir. 2004) ("The inventor's discussion of the disadvantages of the . . . prior art sheds light on the scope of the invention."); *M-I LLC v. FPUSA, LLC*, No. 15-cv-406-DAE, 2015 WL 4460305, at *6 (W.D. Tex. July 21, 2015) ("The Federal Circuit has held that claims should be construed to exclude features described in the patent specification as disadvantages of prior art.") (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1342-43 (Fed. Cir. 2001)).

Finally, WSOU supports Microsoft's position by reemphasizing the point that the word "having" should be given meaning.  Reply at 5.  The parties agree on this point.  The inventors' choice of the word "having," as opposed to "using," "having access to," or "sharing," reinforces the specification's message that each node possesses its own user database.

---

[2] The Background section's use of "and/or" in this passage does not imply that redundancy in the user database is optional, in light of the consistent indications throughout the specification of a required one-to-one relationship between node and user database.  *See, e.g.*, *Watts v. XL Sys., Inc.*, 232 F.3d 877, 883 (Fed. Cir. 2000) (rejecting argument based on patent's use of permissive language in light of "the context of this statement and the entirety of the disclosure").

4.      "activating the AAA functions of the active nodes"

Throughout its briefing, WSOU declines to address the substance of Microsoft's indefiniteness arguments, and instead demands that Microsoft was required to produce expert testimony proving that the disputed terms would not be reasonably understood by a Skilled Artisan.  But the law does not impose such a requirement.  *See, e.g.*, *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017) (citing *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015) ("[a] party cannot transform into a factual matter the internal coherence and context assessment of the patent simply by having an expert offer an opinion on it. The internal coherence and context assessment of the patent, and whether it conveys claim meaning with reasonable certainty, are questions of law."); *Horus Vision, LLC v. Applied Ballistics, LLC*, No. 13-cv-5460-BLF, 2014 WL 6989233, at *6 (N.D. Cal. Dec. 9, 2014) ("The court recognizes that expert testimony is not always required to prove indefiniteness."); *Light Transformation Techs. LLC v. Lighting Sci. Grp. Corp.*, No. 2:12-cv-826-MHS-RHP, 2014 WL 3402125, at *9 (E.D. Tex. July 11, 2014) (finding that expert testimony was not necessary to hold disputed claims indefinite).

In any event, there is no running away from the fact that the phrase "activating the AAA functions of the active nodes" is nonsensical because, according to the '702 patent and WSOU, the AAA functions of "active nodes" have already been activated.  WSOU characterizes Microsoft's supporting evidence as "attorney argument" (Reply at 6), completely ignoring the case law Microsoft cited requiring a patentee's choice of language to be given weight.  *See* Resp. at 14-15 (collecting case law).  WSOU attempts to sidestep this issue by arguing that the words "to be" and "to become" are used interchangeably at one point in the specification.  Reply at 6 (citing '702 patent, 2:13-16).  This fails to address Microsoft's point.  In step (e) of claim 1, when the patentee wanted to refer back to the node "to become an active node" (recited in step

8

(d)), the patentee explicitly referred back to "the node selected in step (d)."  '702 patent, Claim 1. There is no such antecedent reference in step (b), where the disputed phrase is recited. Accordingly, WSOU's sole explanation for how a Skilled Artisan could understand this phrase has no support, and the claim is indefinite.

> **5.** **"geographic distance therebetween is maximized", "geographic distance between active nodes is maximized", "geographic distance between it and the active node which got disconnected from the network is maximized", and "node selected in step (d) is chosen to maximize a sum of a geographic distance between the active nodes and a geographic distance between the node selected in step (d) and the node which got disconnected from the network"**

It is indisputable that there are multiple ways to measure geographic distance.  Contrary to WSOU's assertion, Microsoft is not asking the Court "to take its counsel at their word as to the perspective of a 'Skilled Artisan.'"  Reply at 7 n.2.  The Court does not need to do so; this is a simple fact, which has been acknowledged by multiple courts.  *See, e.g.*, *RideApp, Inc. v. Lyft, Inc.*, No. 18-cv-07152-JST, 2019 WL 7834175, at *11 (N.D. Cal. Oct. 16, 2019); *Fife & Drum, Inc. v. DelBello Enters., LLC*, No. 17-3676, 2019 WL 5692124, at *2 n.6 (D.N.J. Nov. 4, 2019).

Furthermore, WSOU's core argument fails post-*Nautilus*.  WSOU contends that the "maximized" terms are definite because a Skilled Artisan can apply "*any one* of the alleged measurement techniques . . . to determine which pair of nodes has the 'maximized' distance." Reply at 7 (emphasis original).

But the Federal Circuit rejected this argument nearly six years ago when it confronted the question whether, after *Nautilus*, "the existence of multiple methods leading to different results without guidance in the patent or the prosecution history as to which method should be used renders the claims indefinite."  *Dow Chemical Co. v. Nova Chemicals Co. (Canada)*, 803 F.3d 620, 634 (Fed. Cir. 2015).  In *Dow*, the court found that after *Nautilus*, a claim is indefinite when infringement depends on the selection of different methods that lead to different results.  *See id.*

In other words, definiteness now cannot depend on whether a Skilled Artisan can devise some method for meeting a claim limitation, as WSOU claims.  It now depends on whether the claims, specification, and prosecution history provide the required guidance.  *See id.*

Here, the intrinsic record does not provide any guidance on determining when "geographic distance" is "maximized."  *See also Teva*, 789 F.3d at 1344-45 (holding claims indefinite because they "do not indicate which measure to use"); *Inguran, LLC v. ABS Global, Inc.*, No. 17-cv-446-wmc, 2019 WL 943515, at *8 (W.D. Wis. Feb. 26, 2019) ("While a 'you'll know it when you see it approach' may work in other areas of law, this approach is incompatible with the requirement that a patent claim informs 'with reasonable certainty' those skilled in the art about the scope of the invention.") (citation omitted).

WSOU also misses the mark in asserting that "[i]t is basic geometry that two given points will have a distance therebetween."  Reply at 8.  As an initial matter, geometry is not the same thing as geography; the latter takes into account physical features such as lakes, forests, and mountains.  Moreover, even in the context of "basic geometry," distance may vary depending on the method of measurement, which the Skilled Artisan has no way of identifying in the context of the '702 patent.  For example, two points on a sphere (e.g., the earth) have an infinite number of paths that can be used to connect them, and the shortest path connecting them on the surface of the sphere is different from the shortest path connecting them through the sphere.

Finally, WSOU's repeated invocation of inoperativeness and enablement are a distraction.  Microsoft has pointed to controlling Federal Circuit law indicating that claims are *indefinite*, not inoperative or lacking enablement, if they fail to inform the Skilled Artisan what method of measurement should be used in the context of the challenged claims.  WSOU has failed to respond to this authority.

6.     **"logging changes to the user databases for the active nodes thereby updating the same to reflect changes in information contained therein" and "wherein each of the active nodes logs changes to its user database thereby updating the same to reflect changes in information contained therein"**

Microsoft's responsive brief sets forth a clear indefiniteness position supported by case law.  Resp. at 18-20.  Where there are multiple plausible meanings of claim terms, as Microsoft has demonstrated here, and the patent does not provide guidance for choosing between them, the claims reciting those terms are indefinite.  *See Halliburton Energy Servs., Inc. v. M-I LLC,* 514 F.3d 1244, 1251 (Fed. Cir. 2008); *dunnhumby USA, LLC v. emnos USA Corp.*, No. 13-cv-0399, 2015 WL 1542365, at *18 (N.D. Ill. Apr. 1, 2015); *Light Transformation*, 2014 WL 3402125, at *9.  This is not attorney argument, nor does it go to the issues of inoperativeness or enablement.

WSOU continues to rely on the notion that "breadth is not indefiniteness."  Reply at 9 (quoting *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017)).  But the issue here is not breadth; it is ambiguity.  In any event, the "rule" on which WSOU relies applies only when the underlying term at issue has a reasonably understood meaning; the "logging" terms recited in the '702 patent do not.  *See Int'l Test Sols., Inc. v. Mipox Int'l Corp.*, No. 16-cv-00791-RS, 2017 WL 1367975, at *5 (N.D. Cal. Apr. 10, 2017) ("Breadth defined within the language of the patent is permitted. . . . Breadth stemming from ambiguity is not.").

WSOU also repeats its argument that the ambiguous phrase "updating the same" necessarily "refers back to 'the user databases' term[,]" and falsely states that "Microsoft offers no rebuttal to the discussion" allegedly supporting this contention.  Reply at 9.  This argument entirely ignores Microsoft's explanation of equally plausible terms that "the same" could refer to in this context.  *See* Resp. at 19.  There is no support in the patent for why a Skilled Artisan would understand "the same" to refer to "user databases" that are recited in certain claims but not others, when "the same" could reasonably refer to the previously recited "active nodes," or to the

11

"log" of changes discussed in these claim terms.  For this reason, the claims reciting the "logging" terms are indefinite.

### B.     Terms of U.S. Patent No. 7,366,160 (Case No. 6:20-cv-00454-ADA)

With regard to the '160 patent, WSOU's arguments would collapse multiple claim limitations into a single element.  According to WSOU, different "network parameters" can be the same element, and that element can simultaneously satisfy the separately recited "service indicator" limitation.  This interpretation cannot be correct, as it would violate the fundamental principle of claim construction that different claim terms have different meanings.  *See, e.g.*, *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008); *SpaceTime3D, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:19-cv-00372-JRG, 2020 WL 7183538, at *8 (E.D. Tex. Dec. 7, 2020).

### 1.     "selecting two or more parameters of a network" and "measuring and/or calculating at two or more times values of the network parameters"

The purported invention of the '160 patent determines communications network service trends by measuring multiple different network parameters representative of a given service, unlike prior art that determined service trends based on multiple measurements of a single network parameter.  WSOU wants the '160 patent's claims to capture the prior art method.  But the intrinsic evidence demonstrates that *two different types* of parameters are required by these disputed term phrases.  Selecting the same network parameter (such as bandwidth) twice cannot satisfy these limitations.  As explained in Microsoft's responsive brief, both the plain language of the claims and the discussion of the network parameters in the specification confirm that Microsoft's position is correct.  *See* Resp. at  21-23.

As an initial matter, WSOU offers no response to the point that if measuring the same parameter twice could satisfy the "selecting two or more parameters" limitation, it would render

the separately recited "measuring at two or more times" limitation redundant.  Specifically, even if one could select the same parameter twice, as WSOU contends, by measuring the same parameter one does not "measure and/or calculate . . . values of the network parameters" (plural) as the claim requires.  This alone is a sufficient basis to reject WSOU's position.  *See Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016) ("Ideally, claim constructions give meaning to all of a claim's terms.  Construing a claim term to include features of that term already recited in the claims would make those expressly recited features redundant.") (citing *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005)).

Moreover, the '160 patent explains that prior art in the field covers measuring bandwidth twice to determine a bandwidth trend.  *See* '160 patent, 1:10-13 ("BMC Software's 'Patrol Dashboard' product uses a network monitoring method which measures the bandwidth of a network at different times and determines a bandwidth trend as a function of the measurements.").  According to the patent, this and other monitoring methods do not constitute "tools for forecasting accurately the failure of a network service[,]" and "[t]hus there is a need for a method that solves this problem."  '160 patent, 1:24-30.  As explained above, the patent's discussion of the shortcomings of the prior art informs the scope of the claims.  *See, e.g.*, *Cave Consulting*, 725 F. App'x at 995; *Kinik*, 362 F.3d at 1365; *M-I LLC*, 2015 WL 4460305, at *6.  A construction that would allow for the claims to read onto this purportedly flawed prior art would be overbroad.  *See MacroSolve, Inc. v. Antenna Software, Inc.*, No. 6:11-cv-287 MHS-KNM, 2014 WL 243429, at *4 (E.D. Tex. Jan. 21, 2014) ("MacroSolve's construction is too broad

because it potentially encompasses the prior art.  The Background of the Invention section details the disadvantages of the prior art and how the '816 invention avoids these drawbacks.").[3]

Microsoft's construction clarifies that "two or more different types of network parameters" are required to satisfy this limitation.  For example, the limitation may be satisfied by selecting bandwidth *and* jitter, but not by selecting bandwidth twice.  Whether "bandwidth" and "jitter" fall within the same category of "parameters of this kind" does not impact this requirement, despite WSOU's unsupported assertion to the contrary.  *See* Reply at 10.

Similarly, the specification's use of the word "can" in the passages describing the weighting of parameters does not support WSOU's argument that selecting a single parameter twice satisfies the "two or more" limitations.  As WSOU admits, parameter weighting is not expressed as a limitation in any of the claims.  Reply at 10.  The only discussion of parameter weighting comes from the specification.  And the tables and figures in the patent depicting weighting would be rendered absurd if a single parameter was measured twice.  *See, e.g.*, '160 patent, Fig. 2; 4:12-18 ("The measured parameters are represented along three axes defining a three-dimensional space, for example an axis x representing time, an axis y for the parameter values, and an axis z representing the *parameters $P_0$, $P_1$ and $P_2$*."); *see also id.*, 3:30-65 (tables indicating "the weighting or sensitivity of *each parameter*, from 0 for the minimum weighting to 3 for the maximum weighting.") (emphases added).  For a single parameter (such as bandwidth) to be measured twice or to represent multiple parameters in these passages, bandwidth would have to be *weighted against itself*, which is nonsensical.  Thus, the specification's description of weighting further supports Microsoft's construction.

---

[3] To be clear, Microsoft is not arguing that the disputed phrases should be given a special meaning in order to avoid the prior art.  Rather, the operation of the prior art confirms the clear meaning of the claim language, as supported by the patent's written description.

2.      "network parameter"

The key issue to be resolved is whether the "network parameter" limitation is a distinct requirement from the "service indicator" limitation.  Under controlling law, these terms must be distinct.  *See Helmsderfer*, 527 F.3d at 1382; *SpaceTime 3D*, 2020 WL 7183538, at *8.  This argument is decidedly not a "new and unexplained fallback position," as WSOU asserts.  Reply at 12.  Rather, Microsoft's position – which is necessarily correct under fundamental principles of claim construction – has been plain since the beginning of the *Markman* process, when Microsoft proposed *distinct* constructions for "network parameter" and "service indicator."

WSOU offers no response to the binding law underlying Microsoft's position, and instead puzzlingly suggests that a "network parameter" could satisfy the separately recited "service indicator" element because the patent states that a service indicator may be "a collection of parameters."  *Id.*  But "a collection of parameters" is not the same thing as a single "network parameter."  Under WSOU's reasoning, a requirement of a "flock of seagulls" could be satisfied by a single bird.  That is simply not reasonable.

As to the details of Microsoft's proposed construction, the specification clearly establishes that network parameters are measurable.  *See* Resp. at 24-25.  While Microsoft does not disagree that the patent recites "calculated" and "measured" parameter values separately, the specification makes clear that even where parameters are "calculated," they may also be measured.  *See* '160 patent, 3:3-4 ("Parameters that have been *calculated or extrapolated* <u>from measurements</u> can therefore be used.") (emphases added).

The specification also expressly states that network parameters are "also known as service level specifications."  '160 patent, 2:64-65.  WSOU offers no legal reasoning against including "service level specifications" as part of the construction of network parameters.  Instead, WSOU simply refers back to its unsupported assertion that this phrase is part of an

15

"alternative description."  Reply at 12.  But this assertion is at odds with the specification of the '160 patent, which consistently describes its invention within the context of service level agreements.  Resp. at 24; '160 patent, 1:20-22, 4:53-57.  Contrary to WSOU's suggestion that "service level specifications" is a "technical" term that would be "unhelpful" (presumably to a jury) (Reply at 12), this is actually a non-technical concept that illuminates the real-world, business context for the claimed invention.

> 3.      **"determining at two or more times the value of a service indicator", "determining a trend of the indicator", and "determining as a function of the trend of the indicator"**

The parties agree that "determining" cannot mean the same thing as either "measuring" or "calculating," which are separately recited.  *See* Br. at 19; Reply at 13.  The question for the Court to resolve is whether "determining" requires something beyond mere measurement or calculation, or whether, as WSOU suggests, it is broader in scope than "measuring" and "calculating," and can therefore be satisfied by meeting either one of those separately recited limitations.

Only Microsoft's position can be squared with the specification's descriptions of the "determining" step.  As explained in its responsive brief, the specification consistently describes "determining" as involving mathematical functions or other operations using the separately recited measurements and/or calculations.  *See* Resp. at 26.  WSOU simply ignores the extensive intrinsic support for Microsoft's construction, which confirms that "determining" requires an additional step beyond "measuring" or "calculating."

> 4.      **"service indicator"**

As WSOU appears to acknowledge, the primary dispute with regard to the "service indicator" term is whether it must have a distinct meaning from "network parameter."  Reply at

13.  For the reasons explained above, these two terms must be construed to have different meanings.

Moreover, "service indicator" should be construed to refer to the quality of a network service.  In its responsive brief, Microsoft identified intrinsic evidence from the specification and prosecution history confirming that service indicators specifically indicate the level of quality of a provided network service.  *See* Resp. at 27-29.  WSOU ignores that intrinsic evidence, and falls back on the specification's statement that a service indicator may be made up of a collection of network parameters.  That statement, however, does not change the patent's description of what a service indicator does.  Rather, in the example WSOU highlights, the collection of parameters is used to indicate the quality of service.  *See, e.g.*, '160 patent, 2:64-67 ("In this way a number of network parameters . . . can be identified for preferential observation in order to determine the *level of service*."); 3:6-8 ("Parameters of this kind enable the *reliability of the network service to be determined*, for example."); 3:20-22 ("A plurality of network parameters can be selected *to define the level of service* as a function of the service tor group of services concerned.") (emphases added).

### 5. "determining as a function of the trend of the indicator a time of the service indicator crossing a defined threshold"

The '160 patent is directed to predicting when a service on a network (*e.g.*, a video call) will fail.  While the patent acknowledges that the prior art could measure network attributed (*e.g.*, bandwidth) to determine a trend, '160 patent, 1:10-13, it asserts that "[a]t present there are no tools for *forecasting* accurately the failure of a network service." *Id.*, 1:24-25.  The solution to this problem, which the patentee described as distinguishing the '160 patent from the prior art, is the ability to forecast the time remaining before a service indicator crossed a defined threshold (i.e., time until failure).  WSOU asks the Court to ignore the express purpose of the '160 patent,

and interpret its claims to cover prior art that the patentee explicitly distinguished during prosecution.

Microsoft's responsive brief laid out the extensive body of intrinsic evidence (from both the specification and the prosecution history) establishing that the patent requires the invention to determine the time *remaining* before a service indicator crosses a defined threshold.  Resp. at 29-31.  WSOU bizarrely dismisses this as "attorney argument," Reply at 13, even though Microsoft's proposed language comes directly from the patentee's own statements.  Moreover, WSOU offers no response whatsoever to Microsoft's case law holding that "[a]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant" and that "the interested public has the right to rely on the inventor's statements made during prosecution[.]"  *Fenner Invs., Inc. v. Cellco P'ship*, 778 F.3d 1320, 1323, 1325 (Fed. Cir. 2015). Instead, WSOU simply argues that Microsoft has not proven "a clear and unmistakable [prosecution history] disclaimer[.]"  Reply at 13-14 (citing *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1063-64 (Fed. Cir. 2016)).

But insisting on disclaimer through a "'clear and unmistakable' disavowal is . . . unpersuasive" where, as here, the specification itself supports limiting a claim term.  *Cave Consulting*, 725 F. App'x at 995; *see also Trs. of Columbia*, 811 F.3d at 1363 ("Our case law does not require explicit redefinition or disavowal."); *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) ("This clear expression need not be in *haec verba* but may be inferred from clear limiting descriptions of the invention in the specification or prosecution history.").  "We have also found that a patent applicant need not expressly state 'my invention does not include X' to indicate his exclusion of X from the scope of his patent because 'the patentee's choice of preferred embodiments can shed light on the intended scope of the claims.'"

*Trs. of Columbia*, 811 F.3d at 1364 (quoting *Astrazeneca AB v. Mut. Pharm. Co.*, 348 F.3d 1333, 1340 (Fed. Cir. 2004)); *see also On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1333 (Fed. Cir. 2009) (finding disavowal implicitly); *Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1377 (Fed. Cir. 2005) (same).

The consistent disclosures throughout the specification indicating that the '160 patent requires determining the time *remaining* for the indicator crossing a defined threshold, coupled with the patentee's statements during prosecution distinguishing prior art on that very ground, clearly establish that Microsoft's construction is correct.

### 6. "neural network determines rules of association between a service trend and service parameter values"

This phrase is indefinite because "rules of association" does not have a commonly understood meaning to a Skilled Artisan, nothing in the patent is described as a "rule of association," and WSOU cannot identify what would constitute such a rule within the context of the patent. Instead, WSOU continues its campaign of criticizing Microsoft's accurate observations regarding what is disclosed (or not disclosed) by the specification as "attorney argument." Reply at 14.

Microsoft's argument does not hinge on the fact that the term "rules of association" is used only once in the patent. This is simply illustrative of the fact that there is no indication of what the term means—a fact which is reinforced by WSOU's failure to identify any such meaning. WSOU suggests that the lone example of "weighting" as a possible rule of association provides the requisite definiteness for this phrase. *See* Reply at 14-15. But the Federal Circuit

has held that a "lone example" of a phrase does not render it definite if "a skilled artisan is still left to wonder" what else meets the limitation. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1374 (Fed. Cir. 2014); *see also Phoenix Licensing, L.L.C. v. Advance Am.*, No. 2:15-CV-1367-JRG-RSP, 2016 WL 6217180, at *36 (E.D. Tex. Oct. 25, 2016) ("However, this example does not inform, with reasonable certainty, those skilled in the art about the scope of the invention."). That is precisely the case here.

### 7.    "calculating a mathematical expectation of financial loss as a function of the network service trend determined"

WSOU does not dispute that "financial loss" could conceivably refer to any number of scenarios. *See* Reply at 15-16. WSOU only replies that this does not necessarily render the claim indefinite. But the case law WSOU cites for this proposition actually supports *Microsoft's* position. *See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1352 (Fed. Cir. 2009) ("a claim to a formula containing over 5000 possible combinations is not necessarily ambiguous *if it sufficiently notifies the public of the scope of the claims*.") (emphasis added). The '160 patent does not notify the public of the scope of the term "financial loss," and WSOU has not even attempted to demonstrate otherwise.

As to the similarly ambiguous "calculating" and "mathematical expectation" terms, WSOU again offers circular definitions, arguing that "'calculating' is plainly directed to a 'mathematical expectation[,]'" which is itself "an expression of expected 'financial loss[.]'" Reply at 16. WSOU's explanation, even if accepted, does not give any meaning to the terms "mathematical expectation" or "financial loss"—WSOU has simply "defined" each of these ambiguous terms with vague reference to the other.

8.      **"determining a capacity to provide a network service at a given time"**

The '160 patent indisputably uses the word "capacity" to refer to two different scenarios. *See* Resp. at 34-35.  WSOU misdirects by arguing that the '160 patent does not present "divergent lexicography."  Reply at 17.  But Microsoft has never argued that the '160 patent sets forth any explicit definition of "capacity."  The point is that the specification renders the term unclear within the context of the '160 patent, because the patentee uses "capacity" to refer to two distinct concepts, without indicating which concept is encompassed by the claim.

WSOU does not, and cannot, explain whether "capacity," as used in claim 11, refers to the *network's ability* to provide a service, or to a *service provider's willingness* to provide the service.  And "[t]he specification offers no indication, thus leaving the skilled artisan to consult the unpredictable vagaries of any one person's opinion."  *Interval Licensing*, 766 F.3d at 1374 (internal quotation and citation omitted).  "Such ambiguity falls within "the innovation-discouraging zone of uncertainty against which [the Supreme Court] has warned."  *Id.* (internal quotations omitted) (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 (2014)).

C.      **Terms of U.S. Patent No. 8,274,902 (Case No. 6:20-cv-00465-ADA)**

1.      **"network that branches, downstream of the collection point"**

The inventors of the '902 patent took care to describe the context in which their invention could be employed.  Microsoft's proposed construction is faithful to that description, while WSOU suggests that there are no limits on the type of network on which the claimed method may be applied.  All of the intrinsic evidence, as well as the extrinsic evidence proffered by WSOU, supports Microsoft's position that the recited network in this phrase refers to a tree network.  This is unsurprising, because the goal of the '902 patent—to estimate packet loss rates throughout a network by measuring it at one point, not everywhere—depends on knowing "the

21

topology" of the network.  '902 patent, 2:63-65.  That is why the inventors were transparent and unequivocal about the limitation of their method to networks that "may be represented by a tree graph."  *Id.*, 2:36-37.

WSOU continues to object to the formulation of Microsoft's construction, which specifies what this phrase "refers to," as opposed to replacing the entire phrase with a different set of words.  *See* Reply at 18.  Specifically, WSOU asserts, without any supporting authority, that such a construction is improper in the absence of an agreement that the term be afforded its (unspecified) "plain and ordinary meaning."  *Id.*  But WSOU's charge that Microsoft's cited case law is inapposite rings hollow.  Only one of the three exemplary constructions that Microsoft identified in its responsive brief included a construction of "plain and ordinary meaning," *see* Resp. at 37, and no authority precludes a Court from construing a term in light of what the term "refers to."[4]

WSOU attempts to run away from the specification's disclosures limiting the scope of the invention to a method that can be applied only on a tree network by advancing an unnatural interpretation of those disclosures.  Specifically, WSOU argues that because the specification uses the words "can" and "may" in referring to a tree network, the invention can actually be applied on *any* kind of network.  Reply at 18.  WSOU's interpretation would render the relevant passage completely meaningless.  *See* '902 patent, 2:36-37.  If the patentee intended to claim a method that could be applied on any network, there would be no reason to specify a tree network (and no other type of network) within the specification.  Moreover, the '902 patent states that its

---

[4] Notwithstanding WSOU's mischaracterization of the law, Microsoft can agree to construe "network that branches, downstream of the collection point" in accordance with its plain and ordinary meaning as long as any such construction incorporates the requirement that the recited network refers to a tree network.

method can be applied to a tree network without reference to any particular embodiment.  Under these circumstances, the patent's permissive language does not override the evidence from the rest of the disclosure supporting Microsoft's construction.  *See, e.g.*, *Watts*, 232 F.3d at 883 (rejecting argument based on patent's use of permissive language in light of "the context of this statement and the entirety of the disclosure"); *Interwoven, Inc. v. Vertical Comput. Sys., Inc.*, No. C 10-4645 RS, 2011 WL 6936186, at *10 (N.D. Cal. Dec. 30, 2011) ("Just because terms such as 'can' and 'may' appear, does not automatically negate an imposed limitation.").

Lastly, WSOU's arguments regarding the extrinsic evidence are once again incorrect. WSOU does not dispute that the first definition of "branch" from its cited technical dictionary explicitly refers to a "tree structure."  Instead, WSOU attempts downplay the importance of this first definition compared to its preferred second definition by incorrectly stating that "the claim language recites 'branch,' not 'branching[.]'" Reply at 19.[5]  In any event, the extrinsic evidence provides no basis to deviate from the intrinsic evidence's overwhelming support for Microsoft's construction.  *See Phillips*, 415 F.3d at 1317 ("[W]hile extrinsic evidence 'can shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'") (citations omitted).

### 2.    "estimating a packet loss rate" and "an estimate of a packet loss rate"

The '902 patent discloses a specific process for "estimating."  Microsoft's definition captures that process.  WSOU does not appear to dispute (nor could it) that the plain and ordinary meaning of "estimate" is "approximate."  Microsoft's proposed construction will assist the jury by clarifying what the recited "estimating" entails, as described by the '902 patent. *Embrex*, 216 F.3d at 1347; *Iris Connex*, 235 F. Supp. 3d at 847.  For this reason, WSOU's

---

[5] The claim language actually recites "branches" (the verb form of the word).

criticism that Microsoft "merely seeks to substitute its preferred language for what is recited" falls flat.  Reply at 20.  *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1360 (Fed. Cir. 2008) ("[C]laim construction often calls upon words other than those of the patent, lest the claim simply define itself.  'Claim construction' is for the purpose of explaining and defining terms in the claims, and usually requires use of words other than the words that are being defined.") (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)).

### 3.  "packet loss rate"

The parties agree that the '902 patent includes explicit lexicography defining the term "packet loss rate."  After spending two rounds of briefing criticizing Microsoft for proposing clarifying constructions of the claim language, WSOU now pejoratively characterizes adherence to explicit lexicography as "slavish[,]" Reply at 20, but provides no rationale for why its proposed departure from the lexicography purportedly avoids the problem of having the jury determine the meaning of certain terms within the patent.  Even under WSOU's unsupported construction, the jury would still be tasked with determining, for example, what the word "suitable" means within the context of the '902 patent.  *See* Resp. at 39.

The Court should also reject WSOU's newly-asserted construction based on the patent's use of the symbol "δ."  *See* Reply at 21.  Importantly, the specification discusses a "time interval "δ," not a "time-*averaging* interval," which presumably does not carry the same meaning. Therefore, the disclosures related to the symbol "δ" do not shed light on the meaning of "a suitable time-averaging interval" and should not form the basis of whatever construction the Court ultimately adopts.

4.     **"wherein the collected data relate to packet losses on the portion of a GPRS core network extending from the collection point to a plurality of [base / mobile] stations"**

This phrase is indefinite because it requires an impossibility—base stations and mobile stations are part of the radio access network, and therefore a Skilled Artisan would not reasonably understand what is meant by the requirement that they be located on a portion of the GPRS network. In its responsive brief, Microsoft explained this impossibility, and supported its position with intrinsic evidence and relevant case law. *See* Resp. at 40. WSOU dismisses Microsoft's evidence as "conclusory attorney argument," Reply at 21, but notably does not dispute that the GPRS core network does not include base stations or mobile stations.

Instead, WSOU sets forth a strained reading of the claim, suggesting that the base stations and mobile stations are not actually recited as part of the "portion of a GPRS core network." *See id.* at 22. WSOU emphasizes that the claim language recites "*the* portion of a GPRS core network extending from the collection point *to* a plurality of [base stations / mobile stations]." *Id.*(emphasis in original). WSOU apparently reads the claim as requiring a portion of a GPRS network that extends right up to the mobile stations, but without actually including the mobile stations. But even accepting that interpretation, a GPRS network that extended all the way "*to*" the mobile stations would still at least include the base stations, which WSOU does not dispute are *not* part of a GPRS network. Thus, even under WSOU's own interpretation of the claim language, the disputed phrase requires an impossibility. This renders the claim indefinite, not merely inoperable. *See Horizon Pharma, Inc. v. Dr. Reddy's Labs. Inc.*, – Fed. App'x. – , No. 2019-1607, 2021 WL 48428, at *4 (Fed. Cir. Jan. 6, 2021) ("One circumstance in which claims are indefinite is where the claims, as properly construed, are nonsensical.") (citing *Trs. of Columbia*, 811 F.3d at 1366-67)).

DATED: February 24, 2021      By:  /s/ *Irene Yang*                              
                                   Barry K. Shelton
                                   Texas State Bar No. 24055029
                                   SHELTON COBURN LLP
                                   311 RR 620 S, Suite 205
                                   Austin, TX 78734
                                   Telephone: (512) 263-2165
                                   Fax: (512) 263-2166
                                   bshelton@sheltoncoburn.com

                                   *Of Counsel*

                                   Michael J. Bettinger
                                   Irene Yang
                                   SIDLEY AUSTIN LLP
                                   555 California St., Suite 2000
                                   San Francisco, CA 94104
                                   Telephone: (415) 772-1200
                                   Fax: (415) 772-7400
                                   mbettinger@sidley.com
                                   irene.yang@sidley.com

                                   Richard A. Cederoth
                                   John W. McBride
                                   SIDLEY AUSTIN LLP
                                   1 South Dearborn St.
                                   Chicago, IL 60603
                                   Telephone: (312) 853-7000
                                   Fax: (312) 853-7036
                                   rcederoth@sidley.com
                                   jwmcbride@sidley.com

                                   *Attorneys for Defendant Microsoft Corporation*

## **CERTIFICATE OF SERVICE**

I certify that on February 24, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record as identified below.

*/s/ Irene Yang*
Irene Yang